IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 10-cv-01999-MSK-CBS

BARONESS SMALL ESTATES, INC.,

    Plaintiff,

v.

ROUND HILL CELLARS d/b/a RUTHERFORD WINE COMPANY,

    Defendant.

## OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

**THIS MATTER** comes before the Court on the Defendant's Motion for Summary Judgment **(#38)**, to which the Plaintiff responded **(#44)**, the Defendant replied **(#49)**, and to which the Plaintiff filed a sur-reply (#**78**). Also at issue are two joint motions to seal (#**48** & #**58**); the parties seek to keep under seal various briefs and exhibits submitted in connection with the Motion for Summary Judgment. Having considered the same, the Court **FINDS** and **CONCLUDES** the following.

### I. Jurisdiction

The Court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

### II. Background

This is a breach of contract case involving a wine producer, Defendant Round Hill Cellars d/b/a Rutherford Wine Company ("Rutherford"), and a wine distributor, Plaintiff Baroness Small Estates, Inc. ("Baroness"). Rutherford terminated an exclusive distribution agreement with Baroness on the grounds that Baroness had failed to purchase the minimum

number of cases of wine specified by the agreement.  Baroness initiated this lawsuit asserting that the termination was in breach of the contract and that Rutherford committed other breaches in the performance of the Agreement.  Rutherford now moves for summary judgment on Baroness' single claim of breach of contract.

### III.   Material Facts

The Court has reviewed all of the parties' submissions.  For purposes of this Motion only, the Court construes all disputed facts most favorably to the Plaintiff as the nonmoving party.  Viewing the facts in such light, the material facts are as follows.

The parties entered into a five-year Wine Wholesale Distribution Agreement ("Agreement") on or around May 8, 2008.  Pursuant to the Agreement, the parties agreed that Baroness would be the exclusive Colorado wholesale distributor of Rutherford's wines.  The Agreement required Baroness to place orders for a minimum number of purchases each year, but Rutherford was required to fill Baroness' orders, "subject to availability."  Agreement, ¶ III.B.  In the event of shortage in supply, Rutherford was required to "make reasonable allocation of the available Wines."  *Id*.

The Agreement provided:

> Baroness agrees to a minimum amount of nine (9) Liter Cases of
> Wine from the Supplier per year, according to Table I (the
> "Minimum Yearly Purchases").  The Minimum Yearly Purchases
> will consist of the Supplier's Wines/Brands identified on Exhibit A
> or specifically identified in Table 1.

Agreement, ¶ III.E.  Exhibit A listed various brands[1] of wine that would apply against the

---

[1]These brands included Rutherford Ranch, Round Hill, Scott Family Estates, Reindeer Ranch, and pursuant to an amendment to the contract, Lander Jenkins.

purchase quota.[2] Of the specified wines, Baroness was required to buy a minimum number of cases of Round Hill brand wines. In Year 2 of the contract, ending May 31, 2010, Baroness' minimum purchase requirement was 9,300 cases, of which there had to be 4,800 cases of Round Hill wines.

The Agreement further specified that "[i]n the event that Baroness fails to achieve the Minimum Yearly Purchases in the aggregate[,] or if the required volume of the Round Hill brand is not purchased[,] Baroness shall be in default and Supplier's sole remedy is to terminate this Agreement" by giving written notice of termination. Agreement, ¶ III.E, ¶ III.L. Although the Agreement recognized "that any shipping errors, product defects or significant product outages will negatively impact the 'Yearly Purchases,'" it made no special provision with respect to such events. Agreement, ¶ II.D.

The Agreement also anticipated a reduction in the minimum yearly purchase quota in the event that Rutherford increased prices on the specified brands. The parties agree that there were price increases, but they disagree as to the amount by which the increases reduced Baroness' purchase quota. According to Rutherford, the Year 2 quota was reduced by 268 cases; according to Baroness, the quota was reduced by 314. For purposes of this Motion, the Court construes the facts most favorably to the non-movant, Baroness, and therefore assumes that the Year 2 quota was reduced by 314 cases, to result in a minimum purchase requirement of 8986 cases of wine.

It is undisputed that in Year 2, Baroness purchased only 8,102 cases, 884 cases short of the quota. Based on this default, on July 12, 2010, Rutherford gave written notice of its termination of the Agreement.

---

[2] All of the products within each brand were available for purchase towards the quota, which, after Exhibit A was amended, amounted to approximately 25 different products.

During January and February of Year 2, Baroness placed several orders for cases of 1.5 liter Round Hill Chardonnay and 1.5 liter Round Hill Cabernet, which were not filled due to product shortages in the requested sizes.[3] Rutherford failed to fill orders for 345 cases of these wines. However, during these months Rutherford sold 240 cases of Round Hill Cabernet in the 1.5 liter size to another customer to secure the market in another state. A special bottling run was conducted by Rutherford to fill the bottles with a higher grade of wine for the sale to the other customer. In addition, in May 2010, Baroness placed an 18 case order for Round Hill Pinot Grigio, which Rutherford did not fill because the product had been discontinued.

The shortage of these products, which were very popular with Baroness clients, caused Baroness' sales to drop by 37%. Assuming normal sales growth rather than a sales drop, Baroness would have been able to sell (and implicitly would have place orders for) wines sufficient to satisfy its purchase quota.

### IV.   Standard of Review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986);

---

[3]The shortage occurred during an incentive program in January 2010. During the incentive program, Baroness' sales representatives received a cash bonus for every wine display of seven cases or more of Rutherford's wines that were established in retail outlets. In February and March 2010, the focus of the incentive program was Round Hill brand wines.

*Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

When the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a prima facie claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## V. Analysis

To prevail on its claim for breach of the Agreement, Baroness must present evidence sufficient to prove the following elements: (1) the existence of a contract, (2) performance by the plaintiff or that the performance is excused, (3) failure to perform the contract by the defendant, and (4) resulting damages to the plaintiff. *Western Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1057 (Colo. 1992) (internal citations omitted).[4] Rutherford argues that the undisputed facts

---

[4]Although neither party provides a choice of law analysis, they both cite Colorado contract law in support of their arguments. The Court sees no reason to apply any other state's law in this dispute and so the analysis will proceed under Colorado state law. In diversity cases, the forum state's choice of law rules govern. *Berry & Murphy, P.C. v. Carolina Cas. Ins. Co.*, 586 F.3d 803, 808 (10th Cir. 2009). The Agreement does not contain any provision regarding which law should apply, and so general choice of law principles apply. Under Colorado law, the law of the state with the most significant relationship to the claims will be used for both tort and

demonstrate that Baroness failed to meet its purchase obligations under the Agreement, and that Baroness cannot prove that it performed under the Agreement or that Rutherford breached it.

Baroness admits that it did not satisfy its purchase quota for Year 2 in accordance with the Agreement, but argues that its failure is excused because (1) Rutherford prevented Baroness from performing; and (2) Rutherford materially breached the Agreement. Baroness also argues that Rutherford waived its right to terminate the Agreement by waiting six weeks after the Year 2 sales figures were complete to issue the termination letter.

### A. Did Baroness Perform its Obligations Under the Agreement?

Under Colorado law, interpretation of a contract is a question of law. *Ad Two, Inc. v. City and County of Denver, ex rel Manager of Aviation*, 9 P.3d 373, 376 (Colo. 2000). "A court's duty is to interpret a contract in a manner that effectuates the manifest intention of the parties at the time the contract was signed. The touchstone in determining the intention of the parties is the language of the written agreement. If the language is plain, clear and unambiguous, a contract must be enforced as written." *Randall & Blake, Inc. v. Metro Wastewater Reclamation Dist.*, 77 P.3d 804, 806 (Colo. App. 2003) (citations and internal punctuation omitted). Whether a contract is ambiguous is also a question of law for the court. *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1314 (Colo. 1984). A contract is ambiguous when it is susceptible to more than one reasonable interpretation. *National Cas. Co. v. Great Southwest Fire Ins. Co.*, 833 P. 2d 741, 746 (Colo. 1992). If the court concludes that a contract is ambiguous then its meaning is a question of fact to be determined by the finder of fact. *Dorman*

---

contract actions. *ITT Specialty Risk Services v. Avis Rent A Car Systems, Inc.*, 985 P.2d 43, 47 (Colo. App. 1998). Given that the Plaintiff is a Colorado resident and the subject matter of the contract is distribution of wines in Colorado, the dispute has a significant relationship to Colorado. Moreover, it does not appear that application of another state's law would alter the analysis.

*v. Petrol Aspen, Inc.*, 914 P.2d 909, 919 (Colo. 1996).

The parties agree that the purchase quota terms of the Agreement are unambiguous. Under the Agreement, Baroness was required purchase at least 8986 cases of wine by May 31, 2010. It purchased only 8,102 cases. If that failure was without legal excuse, the Agreement provided that Baroness was in default and Rutherford could terminate it.

**B.     Was Baroness' Breach Excused?**

Baroness argues that its failure to meet the purchase quota was legally excused because (1) Rutherford prevented Baroness from performing its obligation; and (2) Rutherford breached the Agreement by failing to provide wines and failing to reasonably allocate the available supply.     **1.     Prevention of Performance**

The prevention doctrine is a generally recognized principle of contract law that provides that if one party prevents or hinders the other party's ability to perform, the other party's failure to perform is excused. *New Design Constr. Co., Inc. v. Hamon Contractors, Inc.,* 215 P.3d 1172, (Colo. App. 2008) (quoting *Moore Bros. Co. v. Brown & Root, Inc.*, 207 F.3d 717, 725 (4th Cir.2000)); *Brush Creek Airport, L.L.C. v. Avion Park, L.L.C.,* 57 P.3d 738, 742 (Colo.App. 2002) ("A party may not rely on the failure of a contract condition if that party contributed to its failure.").

Baroness contends that its purchase quota should be have been reduced or should be excused due to Rutherford's failure to fill its orders. Starting with reduction of the quota, the Court notes that Baroness' purchases were short of its quota by at least 884 cases. Even if the quota was reduced by the number of cases that Baroness ordered but Rutherford did not fill

(calculated by Baroness at 363 cases[5] ), Baroness would still have been short of its quota by 521 cases. Thus, reduction of the quota does not excuse Baroness' default.

The second argument is that Baroness' purchase quota should have been excused because Rutherford's failure to fill its orders adversely impacted Baroness' ability to place the additional required orders. Relying on the affidavit from Tim Dodge, one of its owners, Baroness contends that the supply shortage diminished its sales and therefore the demand for Rutherford's products. Mr. Dodge states that but for the product shortfalls, it would have had greater sales allowing Baroness to order sufficient wine to meet its quota. Round Hill Cabernet and Chardonnay in the 1.5 liter size were Rutherford's most popular products. When Baroness was unable to procure these wines, it lost sales and customers. Mr. Dodge states that when Baroness was unable to sell these two wines, its sales dropped off by 37%. Assuming normal sales growth rather than a sales drop, Baroness would have been able to sell (and implicitly would have ordered) another 521 cases of Rutherford's wines. He then reasons that the lost sales should be counted against the purchase quota.

Although Mr. Dodge's estimates may be accurate and his reasoning might be practical, the Agreement was not a "supply" contract that obligated Rutherford to supply a certain number of cases of wine or to guarantee the availability of product; instead, Rutherford's supply obligation was conditioned on whether the product was available. In contrast, Baroness' obligation to buy was fixed and reduced only in specified circumstances. The purchase quota was not conditioned on Baroness' finances, sales outlook or the reaction of its customers to

---

[5] Baroness submits an affidavit from Tim Dodge, one of its owners, who asserts that Rutherford refused to fill orders for 526 cases. Because the parties appear to agree that only the 363 cases discussed above were actually ordered, the Court uses that number in the analysis. However, even if Mr. Dodge's number is considered as the number of cases of wines ordered but not provided, it would still be insufficient to account for the quota shortfall.

product unavailability.  Although the parties might have anticipated this contingency, the Court cannot rewrite the parties' Agreement.  Because the Agreement did not provide for reduction in Baroness' quota due to circumstances affecting its ability to buy, its failure to meet the purchase quota is not excused.

### 2. Prior Breach

Alternatively, Baroness argues that it was excused from performance because of Rutherford's breach of the Agreement.  *Kaiser v. Mkt. Square Disc. Liquors, Inc*., 992 P.2d 636, 640–41 (Colo.App. 1999) (a material breach by a party deprives that party of the right to demand performance by the other).

Baroness contends that Rutherford breached its obligations under the Agreement by not filling orders for the two Round Hill products during the incentive campaign, and breached its duty of good faith and fair dealing by failing to reasonably allocate product during the shortage.

Under Colorado law, every contract contains an implied duty of good faith and fair dealing.  *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995).  "The good faith performance doctrine is generally used to effectuate the intentions of the parties or to honor their reasonable expectations."  *Id*.  It applies when one party "has discretionary authority to determine certain terms of the contract, such as quantity, price, or time" but does not override express terms and conditions.  *Id*.

The express terms of the Agreement provided that Rutherford "shall fill orders placed by Baroness . . . provided, however, that all such orders shall be subject to availability."  If there were product shortages, Rutherford was required to " make reasonable allocation of the available

Wines."[6] This language is unambiguous. If the wines were available, Rutherford was required to supply them. If the wines were in short supply, Rutherford was required to make a reasonable allocation of them among purchasers. Because what allocation is deemed reasonable could call for the exercise of judgment or discretion by Rutherford, this clause could implicate the covenant of good faith and fair dealing.

As to these claimed breaches, Baroness has the burden of proof. The first issue are is whether the wines were available at the time that Baroness ordered them. As to this, Baroness has presented no evidence.[7] Thus, the Court finds that the wines were in short supply. The question becomes whether Rutherford exercised its discretion in good faith to make reasonable allocations.

The undisputed facts are that Rutherford sold 240 cases in February 2010 to another customer, but such cases were filled with a more expensive bulk wine, which was bottled as the Round Hill Cabernet in a special run for sale to help develop the market in another state. Baroness contends that Rutherford should have made a special bottling run for it as well. The Agreement, however, imposed no such obligation, and the covenant of good faith and fair

---

[6] Baroness also relies on a provision in the Agreement whereby Rutherford was obligated to "provide training, printed materials, customer contacts, sales history reports, and other support to assist the Baroness sales staff in the sale of the Wines." Agreement, ¶ II.B. Baroness argues that the promise of "support" required Rutherford to provide all product ordered by Baroness during the incentive period. This general statement regarding "support" does not override the other express provisions governing the parties' obligations with respect to ordering and fulfillment. *Holland v. Board of County Commissioners*, 883 P.2d 500, 505 (Colo.App. 1994) ("specific clauses of a contract control the effect of general clauses").

[7] Baroness provides evidence that Rutherford's inventory reports showed that the supplies of Round Hill Cabernet and Chardonnay declined rapidly from December 2009 to February 2010 and that Rutherford has failed to explain why it did not accelerate production given that the shortages were foreseeable. Since the parties did not bargain for a guarantee of availability, this does not demonstrate a breach of any express term of the Agreement.

dealing cannot be used to inject substantive new terms into a contract. *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359, 1363 (Colo. App. 1994).

The fact that a higher grade wine was bottled for the sale to another purchaser also undercuts Baroness' contentions of bad faith allocation. Rutherford was required to reasonably allocate the wines that Baroness desired to buy, not to substitute other wines in order to fill its orders. Baroness did not order the wine supplied to the other purchaser, thus such wine was not subject to the reasonable allocation provision.

However, even if Rutherford had been obligated to allocate the wines from the special run to Baroness rather than the other customer, its failure to do so would not constitute a material breach that excused Baroness' purchase obligation. Baroness' purchases were 884 cases short of its quota. Even if the 240 cases sold to the other purchaser had been sold to Baroness, Baroness still would not have met its quota.

### 3.   Waiver

Finally, Baroness argues that Rutherford's termination of the Agreement is void because it did not exercise such right immediately following the end of Year 2, but instead continued to accept orders from Baroness for approximately six weeks before sending notice that the Agreement was terminated. Baroness contends that such conduct constituted a waiver to the right to terminate.

The legal context of this argument is somewhat unclear. In response to Rutherford's motion, Baroness is required to show evidence, which if taken as true, would prove all of the elements of its breach of contract claim. The focus of the parties dispute with regard to this motion is on whether Baroness' failure to purchase its quota of wines was excused and whether Rutherford breached the Agreement. Viewed in this context, the Court understands Baroness to

argue either that the delay in issuance of the termination notice evidences Rutherford's intent to excuse Baroness' breach and waive its right to terminate the Agreement.

A waiver occurs when a party to a contract is entitled to assert a particular right, knows the right to exist, and intentionally abandons that right." *Glover v. Innis*, 252 P.3d 1204, 1208 (Colo. App. 2011). Waiver may be implied as a result of a party's conduct, such as where a party has acts inconsistently with it's rights and prejudice would accrue to the other parties. *Vanderbeek v. Vernon Corp.*, 25 P.3d 1242, 1248 (Colo. App. 2000). However an implied waiver can be found only if the conduct is free from ambiguity and clearly manifests the intent not to assert the benefit. *In re Marriage of Hill*, 166 P.3d 269, 273 (Colo.App. 2007).

The Court begins with the Agreement. It did not specify any time period within which Rutherford was required to terminate the Agreement or notify Baroness of its termination.[8] Thus under its terms no waiver can be inferred.

The earliest time that notice of termination could have been given would have been at the end of Year 2 - May 31, 2010. By June 15, 2010, representatives of Rutherford orally informed Baroness that Baroness had not met its purchase requirement and the Agreement was "null and void." The termination letter followed thereafter on July 12, 2010.

However, Baroness contends that Rutherford's conduct was contrary to these statements. In response to queries about whether Rutherford intended to drop Baroness as a distributor, Craig Cardella, Rutherford's regional manager, told a Baroness sales representative "No, we're not going anywhere. We can't go anywhere." Mr. Cardella responded similarly to an email

---

[8] The Agreement states, "In the event that Baroness fails to purchase the Applicable Minimum Yearly Purchase requirement or fails to purchase the required amount of the Round Hill brand during such year, Baroness shall be in default under this Agreement and [Rutherford] may elect to terminate this Agreement by giving Baroness written notice of termination."

from a Baroness employee. The email sent in late June advised Mr. Cardella that "So, in the last week I've heard that [Rutherford] is moving to Classic & to Southern [other distributors]......Really?!?!?!" In response, Mr. Cardella wrote: "You should hear the rumors I hear every single night from my wife . . . . It's like a bad game of telephone between kids. If I listened to rumors I'd start reading tabloid publications." In addition, Baroness placed additional orders after May 31, 2010, although there is no evidence that these orders were filled by Rutherford.

This evidence is insufficient to demonstrate that Rutherford knowingly intended to waive its right to terminate the Agreement. First, even if construed most favorably to Baroness, the actions of Rutherford are far from clear and unequivocal. On one hand, Rutherford communicated its intent to terminate the Agreement; on the other hand, Mr. Cardella was reluctant to confirm or deny whether termination would occur. Furthermore, it is not clear that Mr. Cardella had authority to decide whether the Agreement was terminated or to communicate that decision to his contact at Baroness.

Finally, even if the statements by Mr. Cardella were authorized and informed, Baroness has not come forward with evidence to show that it relied upon them to its detriment. To the contrary, the sales representative who was told that Rutherford was "not going anywhere" testified in his deposition that he remained uncertain that the Agreement would continue and therefore refrained from placing orders. Thus, on this record, the Court can find no waiver by Rutherford of its right to terminate the Agreement.

The evidence of record, construed most favorably to Baroness, fails to show that its default in satisfaction of its purchase quota was excused, either by prevention of its performance or by Rutherford's actions. Thus, Baroness has failed to come forward with sufficient evidence

to establish all elements of a *prima facie* claim for breach of the Agreement. Accordingly, no trial is required and entry of summary judgment in favor of Rutherford is appropriate.

**D.     Motions to Seal**

The parties have moved to seal the entirety of Baroness' response brief as well as Exhibits H, I, K, L, O, P, V, X, Y, Z, FF, GG, and RR. They maintain Exhibit HHH to Baroness' surreply under seal. As grounds, the parties refer to their Stipulated Protective Order and make conclusory and inspecific statements that these documents contain information relating to Rutherford's pricing, inventory, and business practices and strategies that would reveal business information and give competitors in the wine industry a business advantage. Without stating what efforts they have made to redact documents, they state that there is no less restrictive alternative to sealing the entirety of these documents.

The Supreme Court acknowledged a common-law right of access to judicial records in *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978). This right is premised upon the recognition that public monitoring of the courts fosters important values such as respect for the legal system. *See In re Providence Journal Co.*, 293 F.3d 1, 9 (1st Cir. 2002). Judges have a responsibility to avoid secrecy in court proceedings because "secret court proceedings are anathema to a free society." *M.M. v. Zavaras*, 939 F. Supp. 799, 801 (D. Colo. 1996) (J. Kane).

There is a presumption that documents essential to the judicial process are to be available to the public, but they may be sealed when the public's right of access is outweighed by interests which favor nondisclosure. *See United States v. McVeigh*, 119 F.3d 806, 811 (10th Cir. 1997). It is within the district court's discretion to determine whether a particular court document should be sealed. *See Nixon*, 435 U.S at 599. Only in the rarest of cases is the sealing of documents appropriate. *See Doe v. F.B.I.*, 218 F.R.D. 256, 259 (D. Colo. 2003).

The applicable local rule of this Court, D.C.COLO.LCivR 7.2 (superseded Dec. 1, 2011), specifies what information must be submitted in support of sealing court records: 1) the nature of the material or proceedings at issue; 2) the private interest that, when weighed against the qualified right or presumption of public access to court files and proceedings, warrants the relief sought; 3) the clearly defined and serious injury that would result if the relief sought is not granted; and 4) why a less restrictive alternative to the relief sought is not available.

The parties' representations are insufficient to justify sealing of these documents. First, the parties' agreement as to the confidentiality of documents for the purpose of discovery is not dispositive. The public has a legitimate interest in the information considered by the Court in order to monitor the performance of its duties under the law. Second, the showing made by the parties is too general and inspecific to supercede the public's right to access. There is no designation of what specific information is proprietary or how publication of it will harm Rutherford. Categorical reference to a brief or to an exhibit does not enable the Court to identify what information might be considered confidential, much less any compelling reason to seal it that outweighs the public access.

Finally, the parties have not demonstrated that less restrictive means of protecting the information is unavailable. For example, other than the effect of price increases on the quota, pricing data is irrelevant to the issues here and can be redacted from other exhibits containing such information. Entire e-mails are offered in order to present evidence of one statement contained therein; to the extent that the rest of the email contains sensitive information, it can be redacted. In addition, much of the relevant evidence contained in the purportedly confidential exhibits could be offered in summary form by way of an affidavit, rather than by offering unedited sales data, which reveals far more information than is needed for resolution of the

issues here.

Because no compelling reason has been given for sealing the identified documents, the motions to seal are denied. Baroness' Response shall be immediately unsealed. Redacted or summary exhibits may be filed as substitutes for those under seal within 30 days of the issuance of this order, failing which the existing exhibits will be unsealed.

**IT IS THEREFORE ORDERED** that

(1) Defendant's Motion for Summary Judgment **(#38)** is **GRANTED**.

(2) The parties' joint motions to seal (#**48** & #**58**) are **DENIED WITHOUT PREJUDICE TO REFILING.** Baroness' brief (#**44**) shall be unsealed. The identified exhibits (H, I, K, L, O, P, V, X, Y, Z, FF, GG, RR, and HHH) shall remain sealed for 30 days from the issuance of this order during which time the parties may file redacted or summary exhibits**.**

Dated this 12th day of December, 2011

                                              **BY THE COURT:**

*/s/ Marcia S. Krieger*

                                              Marcia S. Krieger
                                              United States District Judge